Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| ROBERT D., individually and on behalf of H.D., a minor,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD of NORTH CAROLINA,<br><br>　　　　Defendant. | COMPLAINT<br><br>Civil Case No 1:26-cv-00003 |

Plaintiff Robert D. ("Robert") individually and on behalf of H.D. a minor, through his

undersigned counsel, complains and alleges against Defendant Blue Cross Blue Shield of North

Carolina ("BCBSNC") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Robert and H.D. are natural persons residing in Buncombe County, North Carolina. Robert

is H.D.'s father.

2. BCBSNC is an insurance company headquartered in Durham County, North Carolina and was the insurer and claims administrator, as well as the fiduciary under ERISA for the insurance plan providing coverage for the Plaintiff ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Robert was a participant in the Plan and H.D. was a beneficiary of the Plan at all relevant times. Coverage under the Plan ended on June 30, 2025.

4. Plan participants and beneficiaries were told that BCBSNC was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. At all relevant times, BCBSNC acted as the agent for both the Plan and the Plan Administrator for processing claims, communicating with Plan participants and beneficiaries about the status of their claims, and providing relevant documents, records, and other information as ERISA's claims procedure regulations define those terms.

6. H.D. received medical care and treatment at Ironwood Maine ("Ironwood") from May 30, 2023 to October 15, 2023 and Elevations Residential Treatment Center ("Elevations") from October 17, 2023 to October 2, 2024. These are licensed treatment facilities located in Waldo County, Maine, and Davis County, Utah, which provide sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. BCBSNC denied claims for payment of H.D.'s medical expenses in connection with his treatment at Ironwood and Elevations.

2

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because the treatment at issue took place in Utah and because BCBSNC is a member of the nationwide Blue Cross and Blue Shield network of providers and offers insurance coverage in Utah through its regional affiliates.

10. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and H.D.'s privacy will be preserved.

11. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### H.D.'s Developmental History and Medical Background

12. When he was younger, H.D. enjoyed playing with others but had some peer difficulties due to poor self-regulation.

13. H.D. often put his hands on others or interacted in ways they did not want.

14. H.D. was diagnosed with ADHD at age three.

15. In elementary school, he had difficulty controlling himself and often acted out or got into fights.

16. Around age eight, H.D. completed a psychological evaluation due to difficulties with impulse control, aggression, tantrums, and excessive competitiveness.

17. H.D. was diagnosed with major depressive disorder, generalized anxiety disorder, ADHD, and obsessive-compulsive disorder.

18. In third to fifth grade, these behaviors evolved into seeking out other peers who got attention for being disruptive.

19. H.D. began to disregard authority and actively try not to do what was asked.

20. H.D. reported that his depression became more prevalent in fifth grade.

21. Some triggers H.D. reported included losing people and life changes such as moving.

22. In middle school, H.D. became even more focused on peers who were "cool" and aligned himself with others who were attempting to disrupt things at school.

23. H.D. was openly defiant in class, such as turning in assignments with nothing on them.

24. H.D. often made cutting or hurtful remarks and then played them off as humor.

25. There were multiple occasions in H.D.'s early school years that could have resulted in suspension, but instead H.D. spent a lot of time in the principal's office.

26. Nevertheless, H.D. was suspended on one occasion.

27. H.D.'s parents were called by the school at least twice a month about his behaviors.

28. H.D. had issues with lying. For instance, H.D. sent inappropriate emails and lied about it.

29. H.D. struggled with managing his anger from a young age.

30. During his first year of high school, H.D. completely stopped attempting to engage in necessary activities.

31. H.D. stated he was depressed and surrounded himself with other peers who were self-harming by cutting and discussing suicidal thoughts.

32. H.D. also self-harmed with these peers.

33. H.D. became addicted to nicotine and started smoking cannabis.

34. H.D. began engaging more frequently in cutting behaviors and began making comments about not wanting to be here.

35. H.D. was ultimately sent to a wilderness program on May 1, 2023.

36. H.D. was at the program for three weeks; however, he quickly became bonded to another peer and when the program tried to separate the boys, H.D. punched a tree and had to be held down to avoid punching the instructor.

37. As a result, H.D. had to leave the program.

38. H.D. was then admitted to Ironwood.

**Ironwood**

39. H.D. was admitted to Ironwood on May 30, 2023.

40. In a letter dated June 2, 2023, BCBSNC denied coverage for H.D.'s admission to Ironwood as a non-covered benefit.

41. Although BCBSNC denied H.D.'s admission, Robert submitted the remainder of the claims to receive a benefit determination for all dates of service.

42. H.D.'s claims for June 1, 2023, through October 15, 2023, were submitted on July 14, 2024.

43. This claim submission resulted in BCBSNC issuing an Explanation of Benefits statement dated August 21, 2024, denying the remainder of H.D.'s care for a lack of pre-authorization and lack of coverage.

44. On March 20, 2025, Robert submitted a letter to the Department of Insurance explaining that he had retrospectively submitted claims but had not received a response from BCBSNC.

45. In a letter dated March 27, 2025, BCBSNC denied coverage under the following rationale:

> The provider was advised out-of-network (OON) inpatient mental health services with no authorization would be denied. The provider was also advised that residential treatment is covered for mental health and substance abuse but requires prior review and that CPT code H0017 requires authorization. On 6/5/23, the provider contacted our office and was advised CPT code H0019 is not covered and H0018 is valid and billable and does not require authorization. On 6/28/23, the member contacted our office to inquire about mental health benefits and was advised mental health and substance abuse services, and all services rendered OON will apply applicable OON deductible/coinsurance.
>
> Review of the member's account shows an authorization request for care at Ironwood Maine was received on 6/1/23. The request was denied on 6/2/23 as non-covered. Page 58 of the 'What Is Not Covered' section in member's benefit booklet states in residential treatment facilities (except for substance use disorder treatment), or any similar facility or institution are not covered. Ironwood Maine considered themselves as a therapeutic residential boarding school. There is no benefit for these facility types. The denial letter was submitted to the provider. It is the provider's responsibility to notify members of denied services. There are a total of 8 claims on file for Ironwood Maine, with service dates of 6/1/23 10/15/23. All but one of the claims correctly denied due to no authorization. Claim 24205A432600 denied as non-covered in error and is currently being adjusted under 24205A432601 to deny with the appropriate no authorization code. An updated EOB will be sent to the member once the adjustment is finalized.

46. On May 19, 2025, Robert submitted a level one appeal.

47. Robert wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified

reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

48. Robert argued that BCBSNC failed to offer a full, fair, and thorough appeals review process, in violation of his rights under ERISA.

49. Robert explained that his plan allows for retrospective review, but that BCBSNC did not allow him to complete the internal appeals process.

50. Robert asserted H.D.'s treatment at Ironwood was medically necessary, and that the medical necessity of the treatment would be evident if BCBSNC provided a full, fair, and thorough review of his medical records.

51. In addition Robert asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

52. BCBSNC did not respond to this appeal.

### Elevations

53. H.D. was admitted to Elevations on October 17, 2023.

54. BCBSNC approved coverage for October 17, 2023, through October 29, 2023.

55. In a letter dated March 14, 2024, BCBSNC denied coverage under the following

rationale:

> We were not able to approve your coverage request for continued admission to adolescent residential treatment center (RTC) for behavioral health as of 10/30/2023. RTC is a live-in health care facility providing therapy for substance use, mental health, or other behavioral health problems. Ongoing admission to residential care for adolescent behavioral health treatment is only covered when certain condition are met including:
>
> > • You have moderately severe to severe psychiatric symptoms.
> > • You are at risk for harming yourself or other people, or you are not able to take care of daily tasks due to a mental health or substance use disorder.
> > • Treatment at a different level of care (such as a day program, intensive outpatient program or outpatient care) is not good enough.
>
> Your health records show that you have made progress and can be treated outside of a residential facility. Your records do not show that you have high risk of harm to yourself or others.
>
> Your records do not show that a different setting (such as a day program, intensive outpatient program or outpatient care) cannot help you.
>
> Please not approval through 10/29/2023.

56. On April 29, 2024, Robert submitted a level one appeal.

57. Robert again wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

58. Robert expressed concern that the denial of payment for H.D.'s treatment was a violation of MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or

surgical services in the same classification. Robert identified skilled nursing facilities and inpatient hospice care as some of the medical or surgical analogues to the treatment H.D. received.

59. Robert asked to be provided with copies of the medical necessity criteria specific to the Plan that are used to evaluate the appropriateness of treatment in skilled nursing facilities and inpatient hospice facilities.

60. Robert wrote that for BCBSNC to use acute care criteria for sub-acute treatment or to misapply criteria properly used for sub-acute treatment by utilizing acute care criteria in a manner that was more restrictive than the medical necessity criteria for comparable medical and surgical treatment was a violation of MHPAEA.

61. Robert asked that BCBSNC have someone trained in the details of the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) provide input to not only ensure that the Plan was being administered in compliance with this federal law, but also respond to his request for a parity analysis.

62. Additionally, Robert noted that for the approved dates of service, BCBSNC paid only 6.38% of the billed amount.

63. Robert wrote that he did not believe that these payments fell under what is considered a reasonable and customary charge for this service.

64. Robert also asserted that the Plan provided no appropriate residential treatment facilities that were in-network, which would have been able to safely and effectively treat H.D.'s specific conditions.

65. He raised concerns that BCBSNC imposed an impermissible NQTL violation based on network disparity by not having any appropriate adolescent residential treatment centers similar to Elevations in their network.

66. Robert asked that to resolve the disparity, BCBSNC pay these claims at the in-network level and asked that BCBSNC provide him with a list of appropriate in-network residential treatment centers within 100 miles of his home address.

67. In a letter dated May 31, 2024, BCBSNC denied coverage under the following rationale:

> A Blue Cross NC Plan Medical Director along with a Medical Specialist, MD Board Certified in Psychiatry-Child/Adolescent has reviewed the submitted information and states, "Action: Uphold denial for residential treatment facility per external review. Rationale: Based on an additional review by a medical doctor expert Board Certified in Psychiatry and Child & Adolescent Psychiatry, the request for coverage of residential treatment facility is not approved. Upheld- can be managed in a less restrictive setting such as a day program, intensive outpatient program, or outpatient care. The member was originally admitted to a residential treatment center on 10/17/23 and is a transfer from Ironwood Residential Treatment Center in Maine due to failure to progress in treatment. The member has a history of behavioral dyscontrol. The member denied suicidal ideations/homicidal ideations/auditory and verbal hallucinations. The member is a lateral transfer and was not making progress in the previous residential treatment center. It is unclear what another treatment episode would accomplish. As such, MCG Health, Behavioral Health Care 27th Edition, Residential Behavioral Health Level of Care, Child or Adolescent, ORG: B-902-RES (BHG), Effective Date: 09/21/2023 criteria have not been met.

68. On November 22, 2024, Robert submitted a level two appeal.

69. Robert once more wrote that he was entitled to ERISA protections during the review process, including a full, fair, and thorough review.

70. Robert noted that BCBSNC did not reply to his request for a parity analysis.

71. Robert again raised concern that BCBSNC was violating MHPAEA.

72. For instance, he asserted that BCBSNC was relying on acute symptom requirements for H.D.'s subacute treatment.

10

73. Robert also noted that BCBSNC did not respond adequately to his questions about allowed amounts.

74. Robert also raised concern that BCBSNC has misapplied the MCG Guidelines and ignored the very specific information in these guidelines about when a patient is considered eligible for discharge from this level of care.

75. Robert explained that the transition from Ironwood to Elevations was not "lateral" as demonstrated by BCBSNC's authorization of the first 13 days. He gave several reasons why Elevations was better equipped to treat H.D.'s significant and comorbid behavioral health and substance use disorders.

76. Furthermore, he asserted that BCBSNC had once again failed to even reference which specific requirements from the guidelines it utilized were not met.

77. Robert inquired about how he was supposed to respond and argue on H.D.'s behalf when BCBSNC was not participating in meaningful dialogue.

78. Robert also raised concern that BCBSNC's reviewers were not appropriately qualified to review the case.

79. In a letter dated January 9, 2025, BCBSNC denied coverage under the following rationale:

> The external medical panel has denied your appeal. Blue Cross NC will abide by this recommendation. This is Blue Cross NC's final determination in this matter. This decision will apply to any service/claim directly related to this request.

80. On April 24, 2025, Robert submitted an IRO request.

81. Robert again asked for the review protections to which he was entitled under ERISA.

11

82. Robert pointed out that the January 9, 2025, denial letter was not a unanimous decision and that the two independent medical reviewers disagreed on the question of whether H.D.'s treatment was medically necessary.

83. As such, a Blue Cross affiliate, the Plan Medical Director of BCBSNC, stepped in and made the determination that these services were not medically necessary.

84. The reviewer who determined H.D.'s treatment was medically necessary stated the following:

> According to MCG guidelines, residential care was needed due to a lack of adequate patient stabilization or improvement. Risk status was not acceptable for discharge due to the continued concerns about self-harm, passive suicidal ideation through several months into the admission, instances of aggression towards peers. Patient would not be able to participate in monitoring available at lower level of care. Symptoms were not stabilized. He was having difficulty adequately participating in individual, group and family therapy. Substance related disorder was not manageable at a lower level of care due to uncontrolled cravings and difficulty being honest about substance use.

85. Robert noted that the above section from the reviewer's determination is closely aligned with the original argument he made in his level one member appeal, which involved the MCG discharge criteria.

86. In contrast, the review that disagreed with H.D.'s need for treatment stated the following:

> The clinical information provided, and information obtained during the panel discussion, does not indicate that the patient continued to require 24-hour medical and nursing monitoring as of 10/30/2023. The patient was noted to have intermittent episodes of irritability, impulsivity and mood dysphoria which were noted to be his baseline and did not represent a significant change. There was no indication that the patient continued to be at immediate risk of harm to himself or others. The patient was not reported to have any symptoms suggestive of psychosis or mania. There was no indication that the patient continued to exhibit severe or persistent agitation or aggression. There was no indication that the patient continued to engage in self-harming behavior. There was no indication that the patient had any significant medical conditions that required intervention or monitoring. The patient was not reported to have any significant functional impairments including age-appropriate activities of daily living or self-care that represented a change from his baseline. There was no indication that the patient

12

had any significant barriers to treatment in the community including sever ongoing psychological stressors, unsafe living environment or lack of social support. The patient may have been treated safely and effectively in a less restrictive setting and lower level of care such as an intensive outpatient program.

87. Robert asserted that it was abundantly clear that the above reviewer inappropriately utilized the MCG criteria by focusing on H.D.'s lack of acute symptoms, rather than his clear subacute symptoms.

88. Robert expressed concern that BCBSNC claimed to have rendered an unbiased review of H.D.'s treatment via independent reviewers and then allowed a representative of BCBSNC to make the tiebreaking decision on H.D.'s treatment, which just so happened to financially favor BCBSNC.

89. Robert also noted that the tiebreaker reviewer simply quoted the second reviewer's conclusory and problematic denial rationale, without engaging in any way with the rationale provided by the first reviewer.

90. Robert thus outlined requests for future reviewers such as complying with state requirements.

91. In particular, he requested that the assigned reviewer be a psychiatrist board certified in child and adolescent psychiatry and have experience treating adolescents with persistent depressive disorder, severe; anxiety disorder; attention-deficit/hyperactivity disorder (ADHD); oppositional defiant disorder; personal history of self-harm and suicidal ideation; cannabis use disorder, moderate; nicotine dependence; academic and educational problems; parent-child relational problems; and other high risk behaviors in an intermediate residential setting.

92. Robert also asked that the independent review consult be an individual trained in the details of the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) to

ensure that the evaluation of H.D.'s treatment (including any clinical criteria used) do not impose limitations in conflict with the MHPAEA.

93. In a letter dated June 9, 2025, the independent review organization upheld the denial of coverage under the following rationale:

> As of 10/30/23, patient is noted to be calm, complaint and argumentative, eating without noted concerns and watching TX, attending groups with attentiveness and attending schooling as programmed. While patient is noted to have had self-harm scarring as of 10/30/23, these were from days prior and were not noted to be life-threatening in nature and patient was provided with support and education. There were no new wounds or self-harm identified as of 10/30/23 and no indication of active suicidal ideations either. Overall, since admission, patient had been noted to have shown gradual improvement to the point of the patient participation in programming, cueing peer at times, completing chores and advocation for his needs.
>
> As a result, the patient has shown a gradual trajectory of improvement since admission without any indication that he needs to continue 24-hour monitoring and management as is present with residential level of care.
> Instead, patient is noted to be cooperative without any acute medical or psychiatric instabilities that require 24-hour monitoring and management. As such, patient can be managed at a less intensive level of care such as in outpatient programming and engagement of community services as of 10/30/23 forward.

94. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

95. The denial of benefits for H.D.'s treatment was a breach of contract and caused Robert to incur medical expenses that should have been paid by the Plan in an amount totaling over $448,000.

96. BCBSNC failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite Robert's request.

97. BCBSNC also failed to conduct a parity analysis per Robert's request.

//

14

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

98. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSNC, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

99. BCBSNC and the Plan failed to provide coverage for H.D.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

100. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

101. The denial letters produced by BCBSNC do little to elucidate whether BCBSNC conducted a meaningful analysis of the Plaintiff's appeals or whether it provided him with the "full and fair review" to which he is entitled. BCBSNC failed to substantively respond to the issues presented in Robert's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

102. In fact, BCBSNC did not even reply to Robert's appeal for Ironwood.

103. BCBSNC's denial letters rely on formulaic recitations and do not address the arguments raised by Robert in any capacity.

104. BCBSNC and the agents of the Plan breached their fiduciary duties to H.D. when they

failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in H.D.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of H.D.'s claims.

105. The actions of BCBSNC and the Plan in failing to provide coverage for H.D.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

106. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

107. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSNC's fiduciary duties.

108. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

109. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes

16

illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

110. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

111. The Congressional purposes in passing MHPAEA are separate and distinct from the Congressional purposes in passing ERISA. Similarly, the enforcement mechanism for violations of MHPAEA by Plan participants and beneficiaries are different from the enforcement mechanisms participants and beneficiaries have for wrongful denial of plan benefits.

112. The application of the medical necessity criteria used by BCBSNC for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the application of the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

113. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for H.D.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

17

114. When BCBSNC and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

115. BCBSNC and the Plan evaluated H.D.'s mental health claims employing medical necessity criteria in a manner that deviates from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

116. MHPAEA violations can be both quantitative (e.g., a coverage limit of one month for mental health services and six months for medical surgical services) or nonquantitative (such as requiring supervision by a doctor at a mental health facility and a doctor's aide at a medical/surgical facility.)

117. The Departments of Labor and Health and Human Services jointly compiled a list of "warning signs" which often accompany a violation of MHPAEA. A preauthorization requirement for mental health care when no such requirement is imposed on comparable medical or surgical care is one of these signs. BCBSNC placed a preauthorization requirement on H.D.'s mental health treatment but does not universally require preauthorization for analogous medical or surgical care.

118. Another sign of a likely MHPAEA violation is the requirement of improvement for mental health services, but not for medical or surgical services. BCBSNC made the approval of H.D.'s mental health treatment contingent on improvement but does not require improvement for comparable medical or surgical services to be approved.

119. As another example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, BCBSNC's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that H.D. received. BCBSNC's improper use of acute inpatient medical necessity criteria is revealed in the statements in BCBSNC's denial letters such as "records do not show that you have high risk of harm to yourself or others."

120. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that H.D. received.

121. The Plan does not require individuals receiving treatment at subacute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

122. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

123. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

//

124. As another violation of MHPAEA, BCBSNC improperly denied coverage for the claim by wrongfully applying a "fail-first" requirement, that coverage at Elevations would not be covered until treatment was initially attempted at lower levels of care and was found to be ineffective ("[y]our records do not show that a different setting (such as a day program, intensive outpatient program or outpatient care) cannot help you.").

125. In addition, the level of care applied by BCBSNC failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

126. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

127. This use of acute level criteria for a non-acute level of care was not limited to BCBSNC but was also utilized by the external reviewer who dismissed H.D.'s self-harm scarring as from "days prior" but opined that H.D.'s lack of "active" suicidal ideation suggested no need for residential care. Robert noted that BCBSNC restricted the availability of H.D.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. Robert argued that not only did BCBSNC exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. Robert requested to be provided with these criteria if they existed, but BCBSNC ignored this request.

20

128. The actions of BCBSNC and the Plan requiring conditions for coverage that do not align with generally accepted standards of care for treatment of mental health and substance use disorders violates MHPAEA because the Plan does not impose similar restrictions and coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

129. BCBSNC denied H.D.'s outdoor behavioral health treatment in large part on the basis that it was not a covered benefit.

130. They incorrectly cited page 58 and falsely applied a partial quotation to assert residential treatment was not a covered benefit; however, the full sentence refers to education in a residential facility, not residential treatment on its own.

131. Residential treatment is listed as a covered service in the Plan.

132. The Plan purports to rely on generally accepted standards of medical practice when it evaluates the medical necessity of covered benefits. Generally accepted standards of medical practice for residential treatment centers include policies such as regular meetings with a mental health professional and evidence-based treatment interventions.

133. Ironwood and Elevations are licensed treatment facilities and provide treatment in a manner that complies with generally accepted standards of medical practice.

134. In addition, no licensing, regulatory, or accreditation entities require residential treatment facilities be qualified to treat an individual who is an imminent risk of harm to self or others or suffering from other acute level conditions such as active psychosis.

135. Through its imposition of requirements which are stricter than those dictated by generally accepted standards of care as reflected in the licensing, regulatory, and accreditation entity requirements, BCBSNC violates MHPAEA.

136. BCBSNC violates MHPAEA because it relies on generally accepted standards of care and the standards of licensing, regulatory, and accreditation entities to develop its medical necessity guidelines for intermediate level medical or surgical facilities but holds residential treatment to a stricter standard beyond what is advised and considered appropriate by the relevant licensing, regulatory, and accreditation entities.

137. Additionally, for residential treatment facilities providing mental health and substance use disorders, BCBSNC and the Plan fail to provide a comparable degree of network residential treatment facilities compared to the degree of network skilled nursing and inpatient rehabilitation facilities.

138. The failure by BCBSNC and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in a coverage disparity that violates MHPAEA.

139. The failure by BCBSNC and the Plan to provide adequate network facilities for sub-acute inpatient treatment of mental health and substance use disorders compared to the network facilities for sub-acute inpatient treatment of medical and surgical disorders resulted in H.D. having to obtain treatment from a non-network provider.

140. Being forced to go out of network for H.D.'s medically necessary services created a coverage disparity that violates MHPAEA because medical treatment provided by out of network providers are subject to more stringent coverage requirements and conditions than treatment provided by network providers.

141. In addition, being required to obtain treatment from out of network providers subjected Robert to higher cost-sharing obligations and lower benefits under the Plan than if the

22

Plan had an adequate network of mental health providers from whom H.D. could have received treatment. This also violates MHPAEA.

142. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSNC, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

143. BCBSNC and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that BCBSNC and the Plan were not in compliance with MHPAEA.

144. In fact, despite Robert's request that BCBSNC and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, BCBSNC and the Plan have not provided Robert with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, BCBSNC and the Plan have not provided Robert with any information about the results of this analysis.

145. The violations of MHPAEA by BCBSNC and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant due to their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan because of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for his loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for his loss arising out of the Defendant's violation of MHPAEA.

(i) An order requiring the Defendants produce the self-compliance analysis upon request as required by MHPAEA.

146. The remedies the Plaintiffs seek under MHPAEA are not available under ERISA even if they are successful in obtaining remedies for wrongful denial of the Plan benefits.

147. For example, declaratory relief, reformation of the medical necessity criteria, or an order enjoining the Defendants' use of fail-first criteria for medical necessity are not available

as remedies for a wrongful denial of plan benefits.

148. Similarly, an order stating that the Defendants violated MHPAEA by applying acute care criteria to treatment provided in a sub-acute treatment setting is not available as a remedy for wrongful denial of Plan benefits.

149. In short, remedies for the Defendants' violations of MHPAEA may only be provided by appropriate equitable relief under 29 U.S.C. § 1132(a)(3) rather than 29 U.S.C. §(a)(1)(B).

150. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1.    Judgment in the total amount that is owed for H.D.'s medically necessary treatment at Ironwood and Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.    Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

3.    Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.    For such further relief as the Court deems just and proper.

DATED this 8th day of January 2026.

By ____s/ Brian S. King_____
        Brian S. King
        Attorney for Plaintiff

County of Plaintiff's Residence:
Buncombe County, North Carolina

25